UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| JAMAL KHALIL,<br>    Plaintiff,<br><br>v.<br><br>LIBERTY LIFE ASSURANCE COMPANY<br>OF BOSTON a/k/a LIBERTY MUTUAL<br>INSURANCE COMPANY,<br>    Defendant. | C.A. No. 14-468-M |

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., United States District Judge.

Jamal Khalil received long-term disability payments from Defendant Liberty Life Assurance Company ("Liberty") after suffering shoulder and neck injuries resulting from a go-cart accident in 2009. Liberty terminated those benefits at the end of 2013, finding him capable of working based on outside medical reviews and video surveillance it collected demonstrating Mr. Khalil's activities. Mr. Khalil asserts that he continues to be disabled, is entitled to long-term disability benefits, and that Liberty's decision to deny him benefits is rooted in an impermissible structural conflict because Liberty serves as both plan administrator and benefits payer. Both parties have moved for summary judgment.

After a thorough review of the record and the law, the Court GRANTS the Defendant's Motion for Summary Judgment (ECF No. 12) and DENIES the Plaintiff's Motion for Summary Judgment (ECF No. 18).

I.    **FACTS**

Mr. Khalil's go-cart accident occurred at a work-sponsored event in November 2009. At the time, Mr. Khalil worked in a sedentary position as a finance and insurance executive with

Zurich American Insurance Company. He suffered injuries to his upper back, neck, right shoulder, and wrist. He initially received short-term disability benefits through an insurance policy that Liberty administered. An MRI in January 2010 revealed Mr. Khalil had a labral tear of the shoulder. He needed surgery, but it was delayed for a year for several reasons not pertinent to the instant dispute.

Mr. Khalil's employer also had a long-term disability policy ("LTD") for its employees through Liberty. Liberty not only insures the disability with this type of policy, but it also administers any claims on the policy. The policy provides coverage if a participant is disabled from performing the material and substantial duties of his "own occupation" for a twenty-four month period and, thereafter, if he is disabled from performing the material and substantial duties of "any occupation" for which he is reasonably fitted by training, education experience, age, and physical and mental capacity. In June 2010, Liberty approved Mr. Khalil's claim for long-term disability benefits under the "own occupation" definition of the policy. By August 2010, Mr. Khalil's wrist issue was resolved. In December 2010, he had surgery to repair the labral tear in his shoulder. At the beginning of 2011, his shoulder was getting better, but now he had pain in his neck; a cervical neck issue was subsequently identified. He received physical therapy and injections and ultimately he had neck fusion surgery in April 2012.

Because he was still experiencing neck and shoulder pain, Liberty approved his claim for LTD benefits in July 2012 under the "any occupation" definition because he was disabled from performing the material and substantial duties of any other job he is trained, educated and otherwise able to perform. While health professionals discussed other treatment options with Mr. Khalil, including more surgery, Mr. Khalil chose to use ointments and massage therapy to treat his pain.

2

During this entire time, Mr. Khalil continually claimed that he was unable to sit, stand or walk for more than several minutes at a time, and that he was unable to use his upper right extremity whatsoever. During the same 2010-2013 timeframe, Liberty periodically commissioned surveillance of his functional activities, the results of which were captured both in written reports and on video. In September 2013, Liberty engaged a doctor to exam Mr. Khalil. Dr. Ajit Mirani concluded that Mr. Khalil could work only in a sedentary capacity and could not lift, pull or push with his right upper extremity. And while Liberty claims that Mr. Khalil's physical activity during the surveillance period was in stark contrast with both his self-reported limitations and the information he was providing to his treating physicians, Dr. Mirani disagreed, concluding that Mr. Khalil was not exaggerating his symptoms, but rather that the activity in the videos could be due to his use of medicine to relieve his symptoms or the time of day when he generally felt well enough to be more active.

The video surveillance continued in the fall of 2013 and Liberty retained Dr. Gale Brown to review Mr. Khalil's claims. Dr. Brown concluded in a December 2013 report that based on the medical records and the videos, Mr. Khalil's actual functional abilities were better than he reported to Liberty; that he was capable of sedentary work with some restrictions to accommodate for neck and shoulder pain, if he experienced any. Dr. Brown contacted Drs. Fadi Mansourati and Todd Handel, Mr. Khalil's primary care physician and pain doctor respectively, to discuss Mr. Khalil's functioning. Both treating doctors agreed that Mr. Khalil could do sedentary work and therefore was no longer eligible for LTD benefits.

Liberty terminated Mr. Khalil's long-term disability benefits in December 2013. Mr. Khalil appealed in May 2014. In July 2014, Liberty asked an independent consulting firm to assign a doctor to conduct a peer review of the claim. Dr. Chang concluded that the records and

3

surveillance showed that Mr. Khalil was able to work full time in a sedentary capacity with some restrictions. Liberty upheld its decision to deny benefits and this lawsuit ensued.[1]

Mr. Khalil argues that he is entitled to judgment because Liberty's decision to deny his LTD benefits was arbitrary and capricious as it was made through the lens of a structural conflict rooted in Liberty's dual role as plan administrator and benefits payer. Liberty moves for judgment, arguing that its decision was based on substantial evidence from the well-developed record over a three and half year review period (during which it paid Mr. Khalil short-term disability benefits) and was not clouded by its dual role.

## II. STANDARD OF REVIEW

"[I]n an ERISA benefit-denial context, 'the district court sits more as an appellate tribunal than as a trial court.' In such cases, 'summary judgment is simply a vehicle for deciding the issue,' and, consequently, 'the non-moving party is not entitled to the usual inferences in its favor.'" *Cusson v. Liberty Life Assur. Co. of Boston*, 592 F.3d 215, 224 (1st Cir. 2010) (internal citations omitted). In the ERISA policy in this case, the plan administrator "has the absolute authority to determine eligibility for benefits and to interpret the terms of the Plan, in its sole discretion." (ECF No. 13 at ¶ 10). Where an administrator has this discretion, "a reviewing court must uphold that decision unless it is 'arbitrary, capricious, or an abuse of discretion.'" *Cusson*, 592 F.3d at 224 (quoting *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004)).

The Court will first consider whether Mr. Khalil's argument that this Court should review Liberty's decision de novo because Liberty had a structural conflict that dictated a prejudicial

---

[1] Mr. Khalil originally filed his lawsuit in Rhode Island Superior Court. Liberty removed it to this Court based on federal question jurisdiction because the plan is covered by ERISA.

decision against him. Once the standard of review is established, the Court will analyze the record under the appropriate scrutiny.

### III. DISCUSSION

#### A. Dual-Role Conflict

There is no dispute that Liberty did fulfill both administrator and payer roles so, based on the case law, a conflict of interest exists here. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008) (a conflict of interest does exist when a party is both the plan administrator and payer of benefits). Contrary to Mr. Khalil's position that a de novo review is required, however, it is well accepted that trial courts should review denials of LTD benefits under an arbitrary and capricious standard, considering any structural conflicts as only one factor in determining whether the plan administrator abused its discretion, unless he can show that Liberty was improperly influenced by this conflict. *Id.* at 116-17; *see also Cusson*, 592 F.3d at 224; *Denmark v. Liberty Life Assur. Co.*, 566 F.3d 1, 8 (1st Cir. 2009) ("judges should weigh a conflict as they would weigh any other pertinent factor; that is, when the relevant considerations are in equipoise, any one factor, including a structural conflict, may act as a tiebreaker."). In cases where "a conflict has in fact infected a benefit-denial decision, such a circumstance may justify a conclusion that the denial was itself arbitrary and capricious (and, thus, an abuse of discretion)." *Denmark*, 566 F.3d at 9. "With that in mind, courts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decision-making process against the potentially pernicious effects of structural conflicts." *Id.*

Mr. Khalil has not raised whether Liberty took steps to insulate its decision making process,[2] but argues that the record is clear that Liberty's conflict had a pernicious effect based on three actions: 1) it adopted an adversarial attitude toward him by putting him under surveillance, 2) it "doctor shopped" until it found a medical expert who determined that he was not disabled, and 3) Liberty inappropriately encouraged him to apply for Social Security disability benefits in order to off-set amounts it paid to him over the years. The Court disagrees and finds that this conduct does not help Mr. Khalil meet his burden to demonstrate that Liberty's structural conflict influenced the denial of his LTD claim.

### 1. Surveillance

There is no evidence in this record that the surveillance conducted by Liberty was in any way inappropriate. Surveillance has long been recognized "as a useful way to check the credibility of individuals who claim disability based on symptoms that are difficult to evaluate through objective tests." *Gross v. Sun Life Assur. Co. of Can.*, 734 F.3d 1, 25 (1st Cir. 2013). "Where the activities captured on video directly contradict a claimant's asserted limitations, and there is no definitive evidence of a disabling condition, the surveillance alone could provide adequate support for a denial of benefits." *Id.* Moreover, Liberty did not make its decision to deny benefits on only one surveillance session. It surveilled Mr. Khalil on eighteen separate occasions over a three-year period and compared his observed activities against his activities questionnaires. The fact that Liberty engaged in surveillance of Mr. Khalil does not demonstrate that Liberty's structural conflict had an impermissible influence on its decision.

---

[2] The Court does note that upon Mr. Khalil's appeal in 2014, Liberty obtained another opinion of Mr. Khalil's functional capacity. This time, it requested an independent consulting firm to assign a doctor to conduct a peer review of Mr. Khalil's record. The result of that review was another determination that Mr. Khalil was not disabled such that he would be entitled to benefits.

### 2. *Multiple examiners*

The use of multiple examiners was also appropriate on this record. Dr. Ajit Mirani opined in September 2013, based on the medical records and surveillance video generated to that date, that Mr. Khalil was able to work in only a very sedentary capacity and that he could not lift, push or pull with his right upper extremity. (ECF No. 13 at ¶ 148). Up to that point, the videos showed him driving, walking a dog, using his right arm to lift a coffee cup, push a shopping cart, reach, and carry a medium sized bag. (*Id.* at ¶¶ 138-143).

Liberty consulted with additional doctors and got supplemental opinions because the October 2013 surveillance video provided new evidence. That video showed Mr. Khalil transporting heavy music equipment cases to a restaurant, loading and unloading them, setting the equipment up at the venue, and playing keyboard in a band while standing up for two hours. (*Id.* at ¶¶ 150-153). After the concert, he broke down the equipment and transported it all in his car. His behaviors in the October 2013 video relating to his music performance stand in stark contrast to his conduct in earlier videos such that it was not unreasonable for Liberty to get additional medical opinions. After receiving this video, Liberty sought a second consulting opinion from Dr. Gale Brown who opined that the video made apparent that Mr. Khalil could function at a much higher level than he had been reporting to Liberty. (*Id.* at ¶¶ 155-157). While acknowledging that he would have some restrictions to accommodate his neck and shoulder problems, Dr. Brown opined that Mr. Khalil was capable of full-time sedentary work. (*Id.* at ¶ 155). Dr. Brown then consulted with two of Mr. Khalil's treating physicians, Dr. Todd Handel and Dr. Fadi Mansourati, who both changed their opinions about Mr. Khalil's functional capacity from unable to work to able to work in a sedentary capacity. (*Id.* at ¶¶ 158-160).

The Court finds that it was reasonable for Liberty to get additional opinions in light of the new and very contradictory evidence on the October 2013 video and the fact that Liberty had a structural conflict here is not played out in its decision to engage more than one medical evaluation for Mr. Khalil.

    3.    *SSDI*

The Court similarly rejects Mr. Khalil's final argument that Liberty's action in facilitating Mr. Khalil's ultimately unsuccessful SSDI application was prejudicially influenced by its dual roles. There is simply no evidence in the record - and Mr. Khalil points to none - that Liberty's assistance in this regard was motivated by its dual role.

Because none of these allegations show that Liberty was improperly influenced by the structural conflict, the Court does "not accord any special weight to the conflict in [its] analysis of whether Liberty's decision was proper, but rather consider[s] it along with all of the factors present in this case to determine if Liberty's ultimate conclusion regarding [Mr. Khalil's] benefits was 'reasoned and supported by substantial evidence.'" *Cusson*, 592 F.3d at 228 (quoting *Gannon*, 360 F.3d at 213). Now the Court will move to its analysis of the evidence Liberty considered in denying benefits to determine whether it was substantial, making Liberty's decision thereon reasonable and not arbitrary or capricious.

**B.    Denial was Reasonable and Not Arbitrary or Capricious**

The Court reviews Liberty's decision under an abuse of discretion standard and will therefore uphold it if it was "reasoned and supported by substantial evidence in the record." *Id.* "Evidence is substantial when it is 'reasonably sufficient to support a conclusion.' Evidence contrary to an administrator's decision does not make the decision unreasonable, provided

8

substantial evidence supports the decision." *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005) (internal citation omitted).

> 1. *There was substantial evidence that Mr. Khalil's functional capacity exceeded his self-reporting.*

The level of activity or the lack thereof that Mr. Khalil reported to Liberty in support of his claim of continued disability was undermined by the video evidence that Liberty collected during the three years of review. The following are just a sample of these discrepancies.

In June 2010, Mr. Khalil reported that he could not use his right hand, shoulder or wrist, could not drive a car or go anywhere other than the doctor's office. (ECF No. 13 at ¶ 39). The statement is contradicted by surveillance video taken a month later in July 2010 where he was observed driving to the train station and to Dunkin' Donuts. (*Id.* at ¶ 58).

In November 2011, Mr. Khalil reported that he could sit or walk for fifteen minutes and stand for ten minutes; he could not do errands alone or work because he could not stay in one place for more than a few minutes and was on pain killers. He reported having trouble sleeping at night so he slept during the day. (*Id.* at ¶ 99). He was again observed driving his car on errands. (*Id.* at ¶ 90).

In August 2012, Mr. Khalil said he could sit or stand for five to six minutes and walk for two minutes; he could not work because he was in pain most of the day and could not move his neck or shoulder without pain; and he spent his days lying down in different positions. (*Id.* at ¶ 130). However, in that very month, he drove several times to Dunkin' Donuts and drove to Guitar Center where he was observed moving cases around, squatting, extending his arm to reach for things, and standing unassisted for over twenty minutes. (*Id.* at ¶¶ 126, 128). Another day, he drove a young woman at college and lifted and carried a large dog. (*Id.* at ¶ 127).

In June 2013, Mr. Khalil reported that he could alternate sitting for ten minutes and standing and walking for five to ten minutes. (*Id.* at ¶ 136). He can sit in or drive a car for fifteen to twenty minutes. (*Id.*) He reported that he could not work because his shoulder pain prevented him from fully using his right arm, his neck pain prevented him from looking down or sitting in one position; and that he spends his days taking naps and sitting or partially lying down. (*Id.*). He was observed that same month walking a large dog, holding the leash in his right hand, pulling the dog with his right hand, and using his right arm to drink coffee and talk on the phone. (*Id.* at ¶¶ 140-143). He also drove, shopped, held a paint can, and carried a medium sized bag. (*Id.* at ¶¶ 139-143).

Dr. Ajit Mirani's September 2013 reviewing examination concluded that Mr. Khalil could work only in a sedentary capacity with no lifting, pulling or pushing using his right upper extremity required despite the surveillance videos because he felt that Mr. Khalil's activity level could be influenced by his use of medications and the time of day. One month later, the October 2013 video shows Mr. Khalil walking his dog for twenty-three minutes; driving his car to a local restaurant, unloading two large music equipment cases, setting up the instruments, and playing the keyboard in a band for two hours without a break. (*Id.* at ¶ 151). After the concert, the video shows Mr. Khalil breaking down and reloading all of the equipment. (*Id.* at ¶ 152). The evidence in the record as to Mr. Khalil's physical condition despite his self-reports is substantial. Liberty's decision to extinguish his benefits was reasonable.

2.  *Mr. Khalil's treating physicians ultimately opined that he was not disabled.*

After his December 2013 examination, Dr. Gale Brown concluded that Mr. Khalil's actual functional abilities were better than he reported to Liberty and that he is capable of sedentary work with some restrictions to accommodate for any neck and shoulder pain.

Drs. Handel and Mansourati agreed.[3] Dr. Handel, who was Mr. Khalil's pain management specialist, determined after consulting with Dr. Brown and viewing the October 2013 surveillance video that Mr. Khalil was not disabled. Dr. Mansourati, his primary care physician, refused to view the latest video, but nevertheless determined that he could perform sedentary work and therefore supported Liberty's termination of LTD benefits.

Ultimately, Liberty conducted a sweeping review both upon Mr. Khalil's initial application for LTD benefits and after his appeal. It conducted surveillance over a period of three years in an attempt to confirm or deny the veracity of Mr. Khalil's self-reports. During that time, Liberty in fact paid Mr. Khalil LTD benefits. It does not appear to the Court that Liberty acted in a rash or arbitrary manner in its decision-making in Mr. Khalil's case. Because the Court cannot say that the evidence in this case was insufficient to support Liberty's decision to terminate Mr. Khalil's benefits, it is affirmed and Liberty's motion for summary judgment is granted. In light of this ruling, Mr. Khalil's request for discovery is also denied.

## IV. CONCLUSION

Liberty's termination of Mr. Khalil's LTD benefits was reasonable and not arbitrary or capricious. Its dual role was not an impermissible conflict that affected its decision to terminate his benefits. Liberty's Motion for Summary Judgment (ECF No. 12) is GRANTED and Jamal Khalil's Motion for Summary Judgment (ECF No. 18) is DENIED.

---

[3] Mr. Khalil argues that Liberty's decision to disregard Dr. Handel's opinion that he was disabled after a May 2014 surgery was arbitrary and capricious. Liberty argues that it was right to disregard this opinion because Mr. Khalil was no longer covered under the LTD policy in May 2014 because he was not an active employee. Liberty also points out that Dr. Handel only opined that Mr. Khalil was temporarily disabled from working due to the shoulder surgery performed five days earlier. These two facts are undisputed and, as such, the Court agrees with Liberty's position and finds that its decision was reasonably based on substantial evidence in the record.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

November 9, 2015